**SHELL OIL PRODUCTS COMPANY and Shell Marketing Holdings, L.L.C., Appellants,**

v.

**MAIN STREET VENTURES, L.L.C., Appellee.**

No. 05–01–01188–CV.

Court of Appeals of Texas, Dallas.

Sept. 26, 2002.

Rehearing Overruled Dec. 16, 2002.

Samara L. Kine, Baker & Botts, L.L.P., Dallas, for Appellant.

Jeffrey S. Levinger, Carrington Coleman, Sloman & Blumenthal, Brian N. Hail, Godwin & Gruber, Dallas, for Appellee.

Before Justices WHITTINGTON, BRIDGES, and FRANCIS.

## OPINION

Opinion By Justice FRANCIS.

After a jury trial on its claims for fraud, negligent misrepresentation, and breach of contract, Main Street Ventures, L.L.C. ("Main Street") obtained a judgment for $7.367 million in actual damages against Shell Oil Products Company and Shell Marketing Holdings, L.L.C. (collectively "Shell" unless otherwise indicated) and $4.3 million in exemplary damages against Shell Oil Products Company ("Shell Oil"). Shell appeals, asserting: (1) there is legally or factually insufficient evidence to support the jury's damage findings; (2) Main Street's claims sound solely in contract; (3) Main Street's fraud and negligent misrepresentation claims are precluded as a matter of law by the memorandum of in-

tent executed by Main Street and Shell Marketing Holdings, L.L.C. ("Shell Marketing"); and (4) Main Street was not entitled to exemplary damages. Main Street has asserted a single cross-point contending the trial court erred in not rendering judgment on the jury's $3.3 million exemplary damage award against Shell Marketing. For the reasons that follow, we conclude there is no evidence to support the $1.7 million in reliance damages and $4 million in lost opportunity damages found by the jury. The evidence was legally and factually sufficient, however, to support the damages award of $1.667 million for unpaid debts. We therefore reverse the trial court's judgment and render judgment that Main Street take nothing on the reliance and lost opportunity damage elements. In light of our reversal, the jury's $4.3 million in exemplary damages against Shell Oil exceeds the statutory limit. We therefore reform the award of exemplary damages to $3.334 million which is two times the amount of the $1.667 million damage award for unpaid debts. We affirm the trial court's judgment in all other respects.

FACTUAL AND PROCEDURAL BACKGROUND

This matter arises from a soured business relationship between Shell and Main Street concerning the development of a retail business concept that combined a fast-food court with a gas station. According to Main Street witnesses, Ed Blair and Harry Johnson first decided to pursue the fast-food court/gas station concept in 1994. In that regard, Main Street Concepts ("Concepts") was formed to obtain real property and borrow the funds to build the store necessary to implement the concept. With Johnson providing the initial funding, Concepts began building a store at the corner of Beltline and Marsh roads in Dallas. Chevron advanced $150,000 to be the gas supplier at the location. Blair also formed a company called America's Food Courts, L.L.C. to negotiate and obtain various fast-food franchise agreements and handle food operations for the project. Shell had no involvement with Blair, Johnson, or their food court/gas station project up to this point.

Shell representatives first visited the Beltline store prior to its completion and expressed interest in replacing Chevron as the gas supplier for the Beltline location as well as for future store sites. In March 1996, Blair agreed to the switch, and Shell wired Blair $250,000. Blair and Shell also discussed developing additional sites together in the form of a joint venture. The Beltline site opened in August 1996. According to Blair, during several meetings in late August and early September 1996, Shell told Blair and Johnson it would sign a letter of intent to form a joint venture by October 1, 1996, finalize the joint venture paperwork by December 15, 1996, and commence operations on January 1, 1997. In this regard, Blair testified Shell encouraged him to devote his existing resources to an aggressive growth plan. Blair claimed that Shell initially agreed to do five identified sites and budget twelve additional sites by the end of 1997, with as many as 80 to 118 sites in total.

While discussions with Shell continued, Blair received a funding offer from Lyons Financial Services for $4 million in equity capital in exchange for a thirty-five percent interest in "Main Street Holdings/America's Food Courts" which were to be combined into one company. According to Blair, he rejected Lyons's offer based on Shell's articulated commitment to the joint venture project. Blair also testified that Shell discouraged him from bringing in outside funding for the growth plan.

Blair testified that based on Shell's representations regarding its commitment to the joint venture project, how quickly the joint venture would be formed, and the speed with which Shell wanted to develop new sites, he stepped up operations and began to develop other sites with Shell. Blair purchased franchises, incurred architectural and design expenses, and began franchise training and management staffing in anticipation of identified sites in Lewisville, the Woodlands, Valley Ranch, and Spring. Although Shell did not provide a letter of intent by October 1, it continued to express encouragement and support for the joint venture project. Blair indicated that by October 1996, he understood that all major terms of the joint venture were agreed upon. In November 1996, Shell invited Blair on a corporate junket where he talked to Shell's top management about the joint venture. According to Blair, the project appeared to have the highest corporate approval, and Blair witnessed Shell's president tell the vice president of marketing that Shell "needed to figure out how to gear this program up to build a hundred stores a year."

In late November 1996, Blair informed Shell that all of the initial funding he had obtained for the project had been exhausted. He requested that Shell begin contributing cash to the joint venture so that development could continue. Blair began to submit monthly expense reports to Shell which, in turn, sent payments to Blair.

Main Street, the party to this lawsuit, was formed in December 1996. Blair testified that Main Street was the holding company created to be the joint venture partner with Shell. America's Food Courts and Main Street Concepts became wholly owned subsidiaries of Main Street along with other companies including Seamless Technologies, L.L.C. and Main Stop, L.L.C. In the meantime, development on the Lewisville site and other locations continued.

On February 5, 1997, Main Street and Shell Marketing Holdings signed a memorandum of intent to form a joint venture company. The Lewisville store opened in April 1997. In July, Shell appointed Mike Trudell "Retail Manager, Joint Venture" of the Main Street project. However, after reviewing financial data Trudell and another colleague had collected on the Beltline and Lewisville locations, Shell advised Blair at the end of August 1997 it would not advance any more funds to Main Street. The relationship between Shell and Main Street immediately deteriorated, the joint venture paperwork was never completed, and shortly thereafter, Main Street closed its Beltline and Lewisville stores.

Main Street sued Shell in December 1997 alleging Shell destroyed its business. The matter proceeded to trial. The jury made findings favorable to Main Street on its breach of contract, fraud, and negligent misrepresentation claims. With respect to damages for Main Street's fraud and negligent misrepresentation claims, the jury found: (1) Main Street spent $1.7 million of its own money in reliance on Shell's representations; (2) Main Street lost $4 million from turning down opportunities to sell interests in Main Street to others in reliance on Shell promises; and (3) Main Street was unable to pay $1.667 million in debts as a natural, probable, and foreseeable consequence of Shell's conduct. Under Main Street's fraud claim, the jury also found Main Street lost $2.2 million as the foreseeable value of its forty percent interest in the joint venture as of September 1, 1997. Finally, the jury awarded exemplary damages of $4.3 million against Shell and $3.3 million against Shell Marketing. Main Street elected to recover

under its fraud claim but declined the jury's $2.2 million award under this cause of action "to avoid any duplicative recovery." The trial court ultimately rendered judgment in favor of Main Street for $7.367 million in actual damages, $4.3 million in exemplary damages against Shell Oil, plus pre– and postjudgment interest. The trial court rendered judgment notwithstanding the verdict and declined to award the $3.3 million in exemplary damages against Shell Marketing.

DISCUSSION

Tort v. Contract

In its second issue, Shell asserts Main Street was not entitled to tort damages because Main Street's claims are nothing more than a breach of contract claim based upon Shell's alleged failure to perform the joint venture agreement. We disagree.

■ In determining whether the facts of this case support a cause of action for fraud or negligent misrepresentation, we must consider both the source of Shell's duty to act and the nature of the loss sought to be remedied by Main Street. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 45 (Tex.1998). Depending on the circumstances, a party's acts may breach duties in tort or contract alone or simultaneously in both. *See Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986). Thus, if Shell's conduct gives rise to liability independent of whether a contract existed between the parties, Main Street's claim may validly sound in tort. *See S.W. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex.1991). It is also helpful to examine the nature of the injury sustained by Main Street. When the complained-of loss involves solely the economic loss to the subject of the contract, the

claim sounds only in contract. *Reed,* 711 S.W.2d at 618.

■ After examining the nature of the loss and the source of the duty, we conclude Main Street has asserted viable tort claims. Contrary to Shell's contention, Main Street's fraud and negligent misrepresentation claims do not depend on the existence of a joint venture agreement between the parties. Instead, these claims are based on promises and representations regarding Shell's level of commitment to the joint venture and its ability to move forward quickly with the project. Main Street asserts these promises and representations were made to keep Main Street loyal to Shell and prevent it from exploring other alternatives while Shell secretly debated whether to form a joint venture with Main Street at all. Main Street contends it expended its resources in a way that it would not have done but for Shell's promises and representations. As we view Main Street's complaint, it is based on more than just Shell's failure to perform a joint venture agreement. Its complaint encompasses a claim that Shell made promises and representations it knew or should have known to be false at the time they were made. Moreover, Main Street did not seek damages solely for the economic losses resulting from the failure to form the joint venture. Instead, Main Street sought damages for losses it suffered in reliance on Shell's promises and representations, including money spent towards the joint venture, the third-party cash infusion Blair turned down, and debts Main Street was unable to pay as a result of relying on Shell's promises and representations.

Blair testified that had he known the joint venture did not have the necessary management support or that Shell did not have the ability to complete the joint venture paperwork in accordance with the

schedule Shell provided, he never would have devoted existing resources to the aggressive growth plan that Shell encouraged. He would have instead concentrated on making the initial Beltline store profitable.

In reaching the conclusion that Main Street's claims sound in tort, we necessarily reject Shell's contention that the jury's finding that a joint venture agreement existed between the parties as of March 1996 necessarily precludes recovery on Main Street's tort claims. Shell has not cited, and we have not found, any authority for such a position. As explained above, we do not equate the promises and representations of which Main Street complains to a promise to perform a contractual obligation. We therefore resolve Shell's second issue against it.

### Memorandum of Intent

■ In its third issue, Shell contends Main Street's fraud and negligent misrepresentation claims are precluded as a matter of law by the memorandum of intent signed on February 5, 1997. Relying on certain portions of the memorandum, Shell argues Main Street was precluded from relying on any alleged promises or representations made by Shell to support its tort claims. Specifically, Shell cites the following memorandum excerpts to support its position: (1) "the parties would only become bound if definitive Agreements are signed by them," (2) "only the representations and warranties and other terms and conditions of the Agreements, when, as and if executed and delivered, would have any legal effect," and (3) "[a]t any time prior to the execution of the Agreements, either party may terminate negotiations without incurring any obligation whatsoever to the other party." After reviewing the memorandum of intent along with the case law Shell cites to sup-

port its contention, we disagree Main Street's tort claims are precluded as a matter of law on this basis.

Unlike the cases upon which Shell relies, the memorandum of intent signed by the parties was not a definitive written agreement. Instead, it clearly states that except for its confidentiality provisions, it is non-binding. Moreover, in none of the cases cited by Shell did the plaintiff act in reliance on the representations before the agreement was signed. In *C & A Investments, Inc. v. Bonnet Res. Corp.*, 959 S.W.2d 258 (Tex.App.-Dallas 1998, pet. denied), the plaintiff claimed he purchased bonds based on oral representations made by the seller although the purchase agreement he signed expressly provided that plaintiff agreed not to rely on any oral statements made by the seller. Likewise, in *Airborne Freight Corp. v. C.R. Lee Enters.*, 847 S.W.2d 297 (Tex.App. El Paso 1993, writ denied), the binding written contract the plaintiff had signed specifically cautioned against relying on verbal statements contradicting the written agreement. Similarly, the plaintiff in *Fisher Controls Int'l, Inc. v. Gibbons*, 911 S.W.2d 135 (Tex.App.-Houston [1st Dist.] 1995, writ denied) was also precluded from relying on prior oral statements that contradicted the written agreement the parties later signed.

Here, Main Street claimed the memorandum of intent was simply another part of Shell's "string along fraud" designed to keep Main Street loyal to Shell while Shell continued to evaluate and determine whether it truly wanted to enter into a joint venture with Main Street. In light of the above, we cannot conclude the memorandum of intent precluded Main Street's fraud claims as a matter of law. We therefore resolve this issue against Shell. We now turn to the issues involving damages.

## Actual Damages

In its first issue, Shell attacks the legal and factual sufficiency of the evidence supporting the various elements of damages awarded by the jury on Main Street's tort claims. Shell contends there is no evidence or factually insufficient evidence to support the jury finding that Main Street (1) spent $1.7 million of its own money in reliance on promises or representations made by Shell, (2) lost $4 million from turning down opportunities to sell interests in Main Street in reliance on promises or representations made by Shell, and (3) was unable to pay $1.667 million in debts as a result of Shell's conduct. We will address each of these damage elements in turn.

When analyzing a legal sufficiency or "no evidence" issue, we consider the evidence in a light most favorable to the challenged finding, disregarding all evidence and inferences to the contrary. *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex.2001). If there is more than a scintilla of evidence to support the finding, the evidence is legally sufficient and the no evidence challenge must fail. *Formosa Plastics*, 960 S.W.2d at 41.

We examine all of the evidence when reviewing a factual sufficiency challenge to a jury finding. *Tex. Farmers Ins. Co. v. Cameron*, 24 S.W.3d 386, 392 (Tex. App.-Dallas 2000, pet. denied). A finding is set aside only if the evidence is so weak or the finding is so contrary to the evidence that it is clearly wrong and unjust. *Id.*

Shell initially argues that because Main Street was not formed until December 1996, it could not have suffered the losses set forth in the various elements of tort damage found by the jury. Main Street contends that Shell has waived this entity-based argument by failing to raise it in the trial court. We disagree there was waiver. Shell repeatedly raised the issue of whether it could be held liable to Main Street. Among other things, Shell's written motion for a directed verdict contended Main Street was a distinct legal entity from Concepts and therefore was barred from recovering on the asserted claims as a matter of law. Likewise, in its motion for judgment notwithstanding the verdict, Shell asserted that the damage questions required the jury to compensate Main Street and Main Street did not have standing to recover on the claims asserted. In light of the above, we conclude Shell adequately preserved this issue for appellate review. *See* Tex.R.App. P. 33.1(a)(1)(A); *Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex.1991). We will therefore address the merits of Shell's argument.

Although Main Street was not formed until December 1996, it does not necessarily follow that it is precluded from recovering damages based on the asserted claims. In response to a question posed on cross-examination, Blair agreed that Concepts and Main Street were the same for purposes of this lawsuit. There was also evidence that Concepts and America's Food Court were wholly owned subsidiaries of Main Street and that their assets were to be included in the joint venture through Main Street as the holding company. In fact, a Shell document proposing an equity division for the joint venture attributed to Main Street various assets held by other entities such as Concepts and America's Food Court. We therefore reject Shell's argument that Main Street was not the proper party to recover damages under these claims.

Shell also argues there is no evidence Main Street relied on Shell's promises or representations in spending $1.7 million awarded by the jury. Main Street

contends evidence that $1.7 million was spent developing the concept and ultimately lost when Shell refused to go forward with the joint venture is legally and factually sufficient to support the jury's verdict on this element of damage. Questions 3(1) and 7(1) specifically asked the jury to determine "[t]he amount of its own money [Main Street] spent in reliance on ... promises or representations in connection with the transactions between [Main Street] and [Shell]." Neither party has complained about the jury question on appeal. We therefore review the sufficiency of the evidence using the definitions and instructions contained in the jury charge. See Bradford, 48 S.W.3d at 754.

Blair testified that if Shell had told him the joint venture could not be formed in the time frame represented, "We probably wouldn't have jumped out with the resources Mr. Johnson was still ready to contribute and move forward on stores [sic] number[s] three, four, five. We would have kept our operations very condensed at that time and conserve [sic] cash." A Main Street exhibit dated November 5, 1996 indicated that total development costs to date on the food court/gas station project were $1.7 million. Likewise, there was evidence that Johnson had invested over $1.7 million in the food court/gas station project. Blair testified that as a result of his reliance on Shell's representations, the business was destroyed. However, all this evidence taken together does not support a finding that $1.7 million was spent in reliance on promises made by Shell. At best, it shows only what money Main Street claimed was put into the food court/gas station concept as its contribution to the joint venture. In fact, the evidence reveals that monies included in that $1.7 million were Johnson's $300,000 in seed money and a $650,000 loan used to purchase the Beltline property which was bought several months before Shell ever

became involved with Blair and Johnson and the food court/gas station concept.

In reaching this conclusion, we necessarily reject Main Street's contention that evidence the $1.7 million spent in development costs was ultimately lost when Shell pulled away from the project is legally and factually sufficient to support the jury verdict. Simply stated, the question before the jury required the money to be spent in reliance on promises or representations made by Shell. Because the above evidence is no evidence Main Street spent $1.7 million in reliance on Shell's promises and representations, we reverse the trial court's judgment and render judgment that Main Street take nothing on this element of damage.

██ Shell next attacks the jury finding that Main Street lost $4 million from turning down opportunities to sell interests in Main Street to others in reliance on promises or representations made by Shell. Specifically, Shell contends the only offer in evidence was made before Main Street was formed and subject to a condition that was not satisfied. Shell also claims that there was no evidence that Main Street suffered $4 million in damages from this lost investment opportunity. We agree with Shell's latter argument.

██ When properly pleaded and proved, a plaintiff may recover consequential damages that are foreseeable and directly traceable to and result from the fraud. See Formosa Plastics Corp., 960 S.W.2d at 41. Here, the jury awarded Main Street $4 million for a lost opportunity to sell interests in Main Street. The parties agree that the $4 million funding offer from Lyons Financial was the lost investment opportunity on which this award was based. Shell argues, however, that the fact the funding offer was for a total $4 million is no evidence that the

value of the loss or damages resulting from rejecting the offer was $4 million. Main Street counters that it was not required to prove the "net benefit" of the Lyons funding and, if it had done so, its damages would have exceeded the $4 million awarded by the jury. In support of its position, Main Street relies on *In re Coin Phones Inc.,* 203 B.R. 184 (S.D.N.Y. 1996), *aff'd,* 189 F.3d 460 (2d Cir.1999), where a bankruptcy judge added, dollar for dollar, the entire value of a $1.6 million capital infusion to determine a company's value despite the fact that $600,000 of the infusion was to be used to pay an outstanding debt. *Id.* at 215. Main Street's reliance on *Coin Phones* is misplaced.

Initially, we note that unlike *Coin Phones,* there was no evidence specifically detailing how the $4 million would have been used. In *Coin Phones,* there was evidence that the value of the cash infusion was higher than its face value because the infusion would have been used to acquire new phone lines at a fraction of their ultimate value. *Id.* Here, even if we presume the $4 million would have been used to build additional stores, there was no evidence as to how many would be built or what the value of these stores would have been. Main Street did not suffer actual damage merely turning down the Lyons funding offer. There must also be a showing that turning down the offer resulted in injury and proof of the amount of that injury. There was no evidence that the failure to obtain the Lyons funding resulted in $4 million of damages to Main Street. Absent any evidence of damages resulting from Main Street's failure to accept Lyons's offer, we conclude that the evidence is legally insufficient to support the jury's $4 million verdict on this element of damage. Having found in favor of Shell on this basis, we need not address its other issues with respect to this damage element.

■ Shell also challenges the jury finding that Main Street was unable to pay $1.667 million in debts as a consequence of Shell's conduct. Shell asserts there is no evidence or insufficient evidence that (1) the amount of debts awarded by the jury were incurred by Main Street and (2) that Main Street's inability to pay any debt was caused by Shell.

In response to questions 3(3) and 7(3), the jury found that $1.667 million was "[t]he amount of debts that [Main Street] was unable to pay as a natural, probable, and foreseeable consequence of [Shell's] conduct."

Evidence supporting this figure included a document summary entitled "Exhibit A" listing $1,378,377.80 in payables. Blair testified that to this figure, $289,000 needed to be added, representing additional amounts an equipment company was awarded by judgment after the summary was prepared. Shell argues the evidence reveals that the majority of the payables listed on "Exhibit A" were incurred by Main Street's subsidiaries, such as America's Food Courts, and cannot therefore be categorized as Main Street debts. Blair noted that the $1.667 million represented the amount owed to the companies Main Street utilized. Blair also acknowledged that Main Street was responsible for the food court operations. Further, a document entitled "Plan of Exchange" between Main Street and America's Food Court indicates Main Street was to assume all debts of America's Food Courts.

According to the Plan of Exchange, Main Street also agreed to indemnify Johnson and Blair for claims arising out of their status as members of America's Food Courts. Johnson testified that he guaranteed royalty payments to franchisors, payments to some food suppliers, and an equipment lease. He further testified that

as a result of the guarantees, he has paid $82,000, owes another $72,000, and has a judgment against him for $850,000.

Shell also contends that even if these debts can be attributable to Main Street, there is no evidence that they were incurred because of representations made by Shell. According to the question submitted to the jury, however, Main Street was only required to prove that its inability to pay these debts was a "natural, probable, and foreseeable consequence of Shell's conduct." Main Street's theory at trial was that its reliance on Shell's promises and representations caused the destruction of its business and resulted in its inability to pay its debts. Blair testified that Main Street's failure to pay these debts was caused by its reliance on Shell's promises. Because there is evidence that Main Street is ultimately responsible for these debts and its inability to pay them was caused by Shell's conduct, we conclude that the evidence is legally and factually sufficient to support the jury's award on this element of damage.

### Punitive Damages against Shell Oil

In its fourth issue, Shell contends that Main Street is not entitled to exemplary damages because (1) there is no evidence of actual damages, (2) its claims sound only in contract, and/or (3) its fraud and negligent misrepresentation claims are precluded as a matter of law. Having already concluded these underlying arguments are without merit, we likewise reject Shell's challenges to the punitive damage award based on these arguments.

Shell alternatively asserts that if we reverse some but not all of Main Street's compensatory damages, we should remand the cause to the trial court "for reconsideration of the punitive damage award." In support of its position, Shell cites two Texas Supreme Court cases. In

*Haynes & Boone v. Bowser Bouldin, Ltd.,* 896 S.W.2d 179, 181 (Tex.1995), the supreme court remanded to the court of appeals for consideration of the punitive damage award after it reversed nearly all of the actual damages for legal insufficiency. In *Gunn Infiniti, Inc., v. O'Byrne,* 996 S.W.2d 854, 861 (Tex.1999), after eliminating the damages for mental anguish, the supreme court remanded to the court of appeals for reconsideration of the factual sufficiency point previously raised on the amount of the exemplary damages awarded for fraud.

In the case before us, we have reversed a substantial portion of the actual damages awarded by the jury. In fact, the exemplary damage award is currently more than two times the amount of the actual damages that we have affirmed. *See* Tex. Civ. Prac. & Rem.Code Ann. § 41.008(b)(1)(A) (Vernon Supp.2002). However, because Shell has not challenged the factual sufficiency of the exemplary damage award, we conclude that the appropriate disposition is to reform the punitive damage amount to $3.334 million which is two times the amount of affirmed actual damages. *See Gunn Infiniti,* 996 S.W.2d at 861 (reforming additional damages awarded under DTPA to comply with statutory limits after reversing award for mental anguish damages).

### Main Street's Cross–Point

In a single cross-point, Main Street contends the trial court erred in granting Shell's motion for judgment notwithstanding the verdict with respect to the jury's $3.3 million exemplary damage award against Shell Marketing. Specifically, Main Street claims judgment should be rendered on the jury finding because (1) the trial court used an incorrect standard of review in analyzing this issue, and (2)

there was some evidence to support the jury finding.

 A trial court may disregard a jury finding and grant a motion for JNOV only when there is no evidence to support the finding. *Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 227 (Tex.1990). We thus review the trial court's determination under a legal sufficiency standard, considering only the evidence and reasonable inferences that support the jury's finding. *Aquila S.W. Pipeline, Inc., v. Harmony Exploration, Inc.,* 48 S.W.3d 225, 244 (Tex. App.-San Antonio 2001, pet. denied). We may uphold a JNOV only if no evidence supports the jury finding. *Id.* Consequently, the standard of review used by the trial court is irrelevant to our inquiry.

 Punitive damage awards must be supported by clear and convincing evidence. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.003 (Vernon 1997). The jury answered affirmatively to Question 18(2) which inquired, "Do you find by clear and convincing evidence that the harm to [Main Street] resulted from malice or fraud of [Shell Marketing]?"

As a preliminary matter, we note that Shell and Main Street disagree on the standard of review we should employ when considering a legal sufficiency challenge in a clear and convincing evidence case. Although Main Street contends there is no need to alter our traditional standard of review, Shell urges us to use a heightened standard requiring us to determine whether the evidence of fraud or malice is clear and *convincing. We need not decide this issue* because after reviewing the record below, we conclude that under either standard of review, the evidence was legally insufficient to support punitive damages against Shell Marketing.

Evidence at trial revealed that Shell Marketing was an entity created in 1994 or 1995 to handle marketing joint ventures for Shell Oil. Main Street contends evidence that (1) the president of Shell Marketing was the actual signatory on the February 5 memorandum of intent, (2) Shell Marketing had no money budgeted for the Main Street joint venture project at the time the memorandum was signed, and (3) Shell Marketing did not inform Main Street of the internal debate involving whether to proceed with a joint venture with Main Street, is legally sufficient to support the jury's finding. We disagree.

The evidence reveals that although Shell Marketing was contemplated as the formal joint venture partner with Main Street, its direct involvement with Blair and others at Main Street was limited. There was no evidence that the memorandum of intent was fraudulent or that anyone at Shell Marketing knew that the Main Street joint venture would not be formed at the time it was signed. Main Street claims, however, that Shell Marketing's involvement "perpetuated the impression that Shell had authorized and was committed to an expansive joint venture relationship with Main Street." We do not agree this is some evidence to support the jury finding that Shell Marketing, by clear and convincing evidence, was an integral part of a fraudulent scheme to string Main Street along. In fact, there was no testimony about whether anyone at Shell Marketing was aware of what Main Street had been told at the time the memorandum of intent was signed. Although there may have been an internal debate within Shell Marketing about whether to enter into a joint venture with Main Street, there is nothing from which the jury could find by clear and convincing evidence that anyone from Shell Marketing made, knew about, or was responsible for any misrepresentations or promises made to Main Street. Likewise, the mere fact that no money had yet been budgeted for the project at the time the

memorandum was signed does not support the jury finding that Shell Marketing committed fraud by clear and convincing evidence.

To support the jury finding, Main Street also relies on evidence that Gary Hirstein and Dan McCarthy, as employees of Shell Marketing and Shell Oil, met with Blair on one or more occasions, yet concealed from Main Street the reservations and concerns they had expressed in internal corporate e-mails and meetings about the joint venture project. However, the record is completely devoid of the details of any of these meetings with Blair, Hirstein, and McCarthy's or their precise role with respect to their interactions with Main Street, or whether they were aware of what had been represented to Main Street by others. Absent such evidence, we cannot conclude their failure to mention to Blair concerns or reservations they expressed at the internal corporate level is legally sufficient to support the jury finding.

■ Main Street lastly argues that Shell Marketing is indirectly liable for exemplary damages based on its relationship to Shell Oil. Specifically, Main Street argues the exemplary damages awarded by the jury against Shell Marketing are supported by evidence that (1) Shell Oil was a vice-principal of Shell Marketing regarding the Main Street joint venture, (2) Shell Marketing authorized Shell Oil's acts, (3) Shell Oil was employed in a managerial capacity and acting within the scope of its employment, and (4) Shell Marketing ratified Shell Oil's acts.

The evidence regarding the relationship and interaction between Shell Marketing and Shell Oil was scant at best. Relying on Dillard's testimony that Shell Marketing was "an entity formed to own and manage from Shell's perspective any marketing joint ventures," Main Street argues that because Shell Oil employees were involved in negotiations, analyzing joint venture terms, and funding with respect to Main Street, it necessarily follows that Shell Marketing entrusted to Shell Oil management of the entire business relationship with Main Street. We disagree. The record contains no evidence that Shell Oil was representing the interests of Shell Marketing in its dealings with Main Street, nor was there any evidence that Shell Marketing authorized Shell Oil or its employees to make promises or representations on its behalf. Again, there is nothing to suggest that anyone at Shell Marketing was aware of any particular promises or representations employees of Shell Oil made to Main Street. We, therefore, cannot conclude the evidence is legally sufficient to support imposition of exemplary damages against Shell Marketing based on derivative liability. Because there is no evidence to support the jury finding that any harm to Main Street resulted from malice or fraud on the part of Shell Marketing by clear and convincing evidence, we overrule Main Street's cross-point.

### Conclusion

Because we conclude that there is no evidence to support the jury's findings that Main Street (1) spent $1.7 million in reliance on Shell's promises or representations and (2) lost $4 million from declining a third party investment opportunity in reliance on Shell's promises or representations, we reverse the trial court's judgment and render judgment that Main Street take nothing on these claims. In light of our reversal, we modify the jury's exemplary damages award to $3.334 million, which equals two times the amount of the $1.667 million in actual damages remaining. We affirm the trial court's judgment in all other respects.