Jim TRANUM, Appellant

v.

David BROADWAY, Appellee.

No. 10–06–00308–CV.

Court of Appeals of Texas, Waco.

July 2, 2008.

Pat Beard, Waco, TX, for Appellant.

Jim Dunnam, Dunnam & Dunnam, Greg White, Naman Howell Smith & Lee PC, Waco, TX, for Appellee.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

## OPINION

FELIPE REYNA, Justice.

A jury found Jim Tranum liable for malicious prosecution and slander against David Broadway and awarded mental anguish, reputation, and exemplary damages to Broadway. Tranum appeals, arguing that: (1) the evidence is legally and factually insufficient to support malicious prosecution, slander, mental anguish damages, reputation damages, and exemplary damages; (2) the jury's award of exemplary damages is unconstitutional; (3) exemplary damages were not tied to a cause of action; (4) Broadway received a double-recovery of mental anguish damages; (5) in the alternative, the exemplary damages award should be remitted if not stricken; (6) in the alternative, the award of mental anguish damages should be remitted if not stricken; and (7) the trial court abused its discretion by striking expert testimony. We modify the judgment and affirm the judgment as modified.

## FACTUAL BACKGROUND

Tranum employed Broadway as the new car sales manager at Tranum Buick Pontiac GMC in Temple. Broadway later became the general manager for Tranum Ford–Mercury in his hometown of Gatesville. He received monthly compensation, a year-end bonus of twenty percent net profit, ten percent of all credit life insurance, and twenty percent of the proceeds from a car wash owned by Tranum. He used his annual bonuses to purchase stock in the dealership. Broadway and B.J. Shaw, the dealership's bookkeeper, pre-

pared the dealership's monthly financial statements. Tranum reviewed these statements and at the end of each year, he and the board of directors reviewed the dealership's financial records and awarded bonuses. Tranum and his three daughters also received bonuses.

At some point, the dealership began experiencing cash flow problems. Tranum wanted to buy another dealership, but Ford Motor Company had expressed concern about Tranum Ford's "cash position." Broadway and Tranum had discussed the dealership's financial position. According to Broadway, Ford expected the dealership to be "in the black," and Tranum instructed Broadway to "fix it." Broadway knew how Tranum Buick had handled the problem and decided to use this same practice. He would take the "next two or three days' or four days' deposits, post them in the previous month so that it shows that you're in the positive in the bank, send your financial statement off electronically, [and] move the cash back where it belongs." Tranum did not expressly instruct Broadway to use this practice and Broadway did not tell Tranum how he "fix[ed]" the problem. Eventually, a check to Ford Motor Credit bounced due to insufficient funds. Tranum contacted Broadway who informed Tranum that the dealership needed money and had for a "long time." Tranum instructed Broadway to "grow up." Unable to "take the stress anymore," Broadway left the dealership that day, but later returned to clean out his office and deliver his resignation letter to Tranum's daughter. Tranum subsequently invested about $350,000 to "keep the doors open."

A few days later, Shaw issued a written statement wherein she claimed that Broadway instructed her to reverse transactions reflecting a loss, not show overdraft charges on the financial statements, and alter the statements to show a profit by increasing costs, offsetting expenses, and performing transactions to "bring his bottom line up." Broadway had assured Shaw that Tranum was aware of these practices and that Tranum Buick also used these practices. Shaw wrote that she once attempted to quit when she discovered that someone had gone through her office, misplacing and disposing of records, but Broadway threatened to "blame everything" on Shaw. Broadway told Shaw to follow his instructions or she would lose her job and that Tranum would "stand behind him." Shaw stated that Broadway did not care if she was unable to balance the books.

According to several witnesses, Tranum began accusing Broadway of theft, embezzlement, and misappropriation. Broadway sued Tranum for slander and slander *per se.* Tranum's accountant, Steve Niemeier, subsequently issued a report after examining the dealership's financial records at Tranum's request. Niemeier found that: (1) certain accounts were not reconciled to the general ledger during the applicable dates; (2) operating expenses were "inappropriately deferred as increases to inventory"; (3) "financial statement items" were "increased to a value that exceeded what was considered a reasonable balance"; (4) "the Dealership had delayed reporting sales activity in order to delay required loan payments"; (5) "parts inventory" was "significantly overstated"; (6) "collection procedures significantly reduced the claims receivable account"; (7) $13,789.09 in "[i]ndividual customer accounts" were "doubtful for future collection"; (8) $9,050 in operating expenses had been "added to inventory"; (9) "retained earnings" were "reduced to a deficit balance;" (10) Broadway charged $10,232.57 in personal expenses to the dealership; and (11) Broadway received $82,091 in bonuses as a result of the above transactions.

Tranum delivered Shaw's statement and Niemeier's report to Coryell County District Attorney Riley Simpson. Bruce Beals, a legal assistant with the district attorney's office, reviewed these documents and prepared a memorandum concluding that Broadway: (1) "committed a theft by deception"; (2) "intentionally misrepresented the amount of annual net profit of Tranum Ford–Mercury in order to obtain a yearly bonus, thereby unlawful[ly] appropriating funds"; and (3) received bonuses in excess of $20,000, but less than $100,000. Beals recommended that an indictment be prepared charging Broadway with "Theft over $20,000, but less than $100,000." Simpson presented the indictment to the grand jury, which returned a "no bill." Broadway then amended his lawsuit to allege malicious prosecution.[1]

At trial, Tranum admitted that Broadway advised him of the dealership's financial problems, but testified that he did not perceive a problem in light of financial statements reflecting a positive cash flow. He denied knowing that Broadway was altering financial statements until after Broadway resigned and Shaw informed him of the situation. However, at her deposition, Shaw testified that Tranum instructed her to write the statement under threats that she would go to jail and have her children taken away. Shaw was afraid and wrote what she thought Tranum wanted to hear. Tranum denied threatening Shaw and accused Shaw of lying.

Tranum testified that he would not have approved even if he had known of Broadway's actions. He denied altering the books at his other dealerships or instructing Broadway to do so, but admitted lying to General Motors to conceal a negative cash balance and submitting documents that misrepresented the "true state of the bank accounts." He testified that documents were sometimes altered, probably at his direction, to show that the dealership had more money in the bank, but did not misstate assets, liabilities, expenses, income, or losses. He would have no complaints had Broadway used these practices. He claimed that the "bottom line," "net worth of the financial statement, the assets, [and] the liabilities" never changed.

Dorothy Haddox, former bookkeeper for Tranum Buick, testified that Tranum never instructed her to change or alter an accurate financial statement. Haddox testified that General Motors did not like to see statements showing a negative cash balance. Therefore, Tranum instructed Haddox not to show a negative cash balance on the statements and reviewed statements thoroughly to ensure that such a balance was not shown. Haddox explained that she would increase the account balance and decrease the inventory, but the bottom line never changed. She corrected the statements after submitting them to General Motors. Haddox denied changing statements to obtain a "better bottom line," transferring items between expense and asset accounts, deferring operating expenses as increases to inventory, overstating accounts receivable or parts inventory, delaying reports of sales activity, or failing to record operating expenses, payments, loans, checks, or bank charges. She did not recall using "bad accounting practices" or being asked to do so.

Jack Ralston, general sales manager for Tranum Auto Group, testified that Broadway had contacted him and admitted his failure to timely pay off vehicles. Broadway was "concerned" and "distraught," could not pay the amount owed to Ford Motor Credit, had not yet told Tranum that he could not pay Ford, and expected

1. Broadway also alleged that Tranum de- frauded the corporation and its shareholders.

to lose his job. Broadway did not admit to any other improprieties. He had never asked Ralston about inappropriate accounting practices. Ralston was unaware of any such practices at Tranum Auto and testified that Tranum never failed to timely pay invoices, post expenses to proper accounts, write off uncollectible accounts, or adjust inventory accounts to their proper value. Ralston visited Tranum Ford and found some evidence that dealership funds were used to pay Broadway's personal expenses. Although he did not "dig too deep," Ralston found no evidence of any other problems.

Tranum denied knowing or approving of Broadway's use of dealership funds to pay personal expenses. Broadway testified that he used his personal credit card to make purchases for the dealership, including a car wash owned by Tranum. Broadway was not reimbursed for these expenses, but rather gave the bills to the bookkeeper. Broadway further testified that the dealership paid the dry cleaning bill for his work clothes and also paid his personal expenses during a "good year," which Tranum knew. Tranum denied allowing managers, employees, or family members to use company funds to pay personal expenses. Ralston confirmed this fact, but also testified that he had used his personal credit card to make purchases for Tranum Auto and submitted receipts to the bookkeeper for reimbursement. Haddox testified that Tranum Buick may have paid some personal expenses, but nothing major.

The jury found that: (1) Tranum maliciously prosecuted Broadway, proximately causing damage to Broadway's name and reputation in the amount of $75,000 and emotional distress and mental anguish in the amount of $500,000; (2) Tranum slan-

dered Broadway, proximately causing Broadway to suffer emotional distress and mental anguish in the amount of $250,000; (3) Tranum acted with malice, entitling Broadway to exemplary damages in the amount of $750,000; and (4) Broadway breached his fiduciary duty to Tranum Ford, proximately causing $3,000 in damages.[2]

## LEGAL AND FACTUAL SUFFICIENCY

In his first issue, Tranum argues that the evidence is legally and factually insufficient to support: (1) malicious prosecution; (2) slander; and (3) damages.

### Standards of Review

A legal sufficiency challenge requires consideration of "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). We "must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.*

A factual sufficiency challenge to issues on which the appellant did not bear the burden of proof requires us to "consider and weigh all of the evidence." *Checker Bag Co. v. Washington,* 27 S.W.3d 625, 633 (Tex.App.-Waco 2000, pet. denied). We may not pass upon the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence would clearly support a different result. *Id.* We will reverse the "verdict only if it is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust." *Id.* Reversal can occur because the finding was based on weak or

**2.** The jury also found that Tranum did not convert property of Tranum Ford but breach-

ed his fiduciary duty to Tranum Ford, causing no damages.

insufficient evidence or because the proponent's proof, although adequate if taken alone, is overwhelmed by the opponent's contrary proof. *Id.*

### Malicious Prosecution

■ The elements of malicious prosecution are: (1) commencement of a criminal prosecution against the plaintiff; (2) the defendant's initiation or procurement of that prosecution; (3) termination of the prosecution in the plaintiff's favor; (4) the plaintiff's innocence; (5) lack of probable cause to initiate the prosecution; (6) malice in filing the charge; and (7) damage to the plaintiff. *See Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 n. 3 (Tex. 2006). Tranum challenges elements two, four, five and six. We will address these elements in the order addressed by Tranum.

### Innocence

■ To prevail on a malicious prosecution claim, a plaintiff must prove his innocence of the crime charged. *See Kroger*, 216 S.W.3d at 792. Broadway was charged with theft of more than $20,000 but less that $100,000. *See* TEX. PEN.CODE ANN. 31.03(a), (e)(5) (Vernon Supp.2007).

■ Because the jury found that Broadway breached his fiduciary duty to Tranum Ford, Tranum argues that the same evidence supporting this finding also supports a finding of Broadway's guilt: (1) Niemei-

er concluded that Broadway received $82,091 in bonuses as a result of altering the financial statements; (2) Broadway admitted altering the financial statements to inaccurately reflect a positive cash flow; (3) Broadway admitted that Tranum did not instruct him to use this practice or provide any "direction" as to how to "fix" the problem; (4) Broadway did not tell Tranum that he altered the financial statements; (5) Shaw stated that Broadway instructed her to engage in improper accounting practices; (6) Broadway charged approximately $10,000 in personal expenses to the dealership; and (7) Broadway used his bonuses to purchase stock in the dealership in order to ensure its "paper profitability" and guarantee "a return on his investment by rigging the books to show paper profits."[3] Broadway responds that he acted with Tranum's knowledge or "tacit instruction." A "crucial element of theft is the deprivation of property from the rightful owner, without the owner's consent." *Stewart v. State*, 44 S.W.3d 582, 589 (Tex.Crim.App.2001); *see* TEX. PEN. CODE ANN. 31.03(b)(1) (Vernon Supp.2007). If Broadway acted with Tranum's consent, he cannot be guilty of theft.

■ The record contains some evidence that this element of theft was not met. Neither Ford nor General Motors wanted to see financial documents reflecting a negative cash balance. Neither did Tranum. Tranum thoroughly examined Tra-

---

3. The theft charge appears to be based on Broadway's receipt of $82,091 in bonuses as a result of altering financial statements, rather than his use of company funds to pay personal expenses. In Beals's memorandum, he concluded that Broadway committed "theft by deception:"

> Specifically, Broadway intentionally misrepresented the amount of annual net profit of Tranum Ford–Mercury in order to obtain a yearly bonus, thereby unlawful[ly] appropriating funds (property) from Tranum.

These bonuses totaled more than $20,000 but less than $100,000.

Beals further noted that, during his interview with Niemeier and a discussion as to personal expenses, "Niemeier cautioned that consideration should be given to determine if Mr. Tranum made the same kinds or types of expenditures and listed them as business expenses also." Accordingly, we will focus our analysis on Broadway's receipt of bonuses rather than payment of personal expenses.

num Buick's financial documents to ensure that such a balance was not shown and also reviewed the financial documents for Tranum Ford both monthly and annually. He and Haddox had altered the financial statements at Tranum Buick to inaccurately reflect a positive cash flow. Haddox testified that whenever a financial statement showed a negative cash balance, she was instructed to correct the statement. Having worked for Tranum Buick, Broadway was apparently aware of this practice and knew that Tranum did not like to see a negative cash balance. When Tranum similarly instructed Broadway to "fix" the problem, Broadway responded by following the same practice used at Tranum Buick to "fix" a similar problem: altering the financial statements to inaccurately reflect a positive cash flow. Regardless of whether Broadway and Tranum used different types of transactions to achieve this goal, the result is still the same.

The circumstances surrounding Shaw's written statement also indicate that Tranum knew about the accounting practices at Tranum Ford. Broadway told Shaw that other dealerships, particularly Tranum Buick, had used the same types of practices and that Tranum knew about these transactions. Although Shaw later expressed doubt as to the truth of her written statement, she also testified that, to the best of her knowledge, she believed her statement to be true at the time it was written. The jury bore the burden of reconciling any conflicts between Shaw's written statement and her subsequent testimony, as well as deciding what facts to believe. See City of Keller, 168 S.W.3d at 820. That Tranum may have threatened Shaw into preparing her statement could also lead the jury to question Tranum's reasons for threatening Shaw, and ultimately, his lack of knowledge or involvement in Broadway's actions.

As the "sole judge of the credibility of the witnesses and the weight to give their testimony," the jury could reasonably conclude that Tranum was aware of and possibly orchestrated Broadway's actions. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex.2003). The jury was entitled to disbelieve Tranum's testimony to the contrary. *See City of Keller*, 168 S.W.3d at 819; *see also Hinkle v. Hinkle*, 223 S.W.3d 773, 778 (Tex.App.-Dallas 2007, no pet.). The jury's findings that both Tranum and Broadway breached their fiduciary duties to Tranum Ford seem to indicate that the jury believed that Broadway was not acting on his own. Accordingly, the jury could reasonably conclude that Broadway was innocent of the theft charges brought against him because he did not act without Tranum's consent, an essential element to the offense of theft. *See* Tex. Pen.Code Ann. 31.03(b)(1); *see also Stewart*, 44 S.W.3d at 589.

**Probable Cause**

 Under the probable cause element, we consider "whether a reasonable person would believe that a crime had been committed given the facts as the complainant honestly and reasonably believed them to be before the criminal proceedings were instituted." *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 517 (Tex.1997). A presumption exists that the "defendant acted reasonably and had probable cause to initiate criminal proceedings." *Kroger*, 216 S.W.3d at 793. "To rebut this presumption, the plaintiff must produce evidence that the motives, grounds, beliefs, or other information upon which the defendant acted did not constitute probable cause." *Id.* We consider "only whether the complainant reasonably believed that the elements of a crime had been committed based on the information available to the complainant before criminal proceedings began." *Richey*, 952

S.W.2d at 519. When the facts are disputed, the jury "must weigh evidence and resolve conflicts to determine if probable cause exists, as a mixed question of law and fact." *Id.* at 518. When the facts are undisputed, "probable cause is a question of law" for the court. *Id.*

Based on Broadway's prompt resignation and alleged confiscation of a company computer, Shaw's written statement, Niemeier's report, and Broadway's statements to Ralston, Tranum argues that he reasonably and honestly believed that Broadway was guilty of committing a crime. He relies on *Kroger* to support his position. In *Kroger*, Theresa Suberu went to the Kroger pharmacy to purchase medication. *See Kroger*, 216 S.W.3d at 791. Suberu told the pharmacy technician that she was going to retrieve some extra cash from her vehicle. *Id.* The manager stopped Suberu from leaving the store. *Id.* The manager claimed that Suberu was "pushing a grocery cart full of unsacked goods." *Id.* Suberu denied using a cart that day. *See id.* Other Kroger employees also saw Suberu pushing a cart. *Id.* Suberu explained that she was going to retrieve money from her vehicle. *Id.* at 792. No one spoke to the technician to confirm Suberu's story. *Id.* Suberu was arrested, acquitted of misdemeanor theft, and later filed suit for malicious prosecution. *Id.* The Supreme Court found Suberu's testimony legally insufficient to rebut the presumption of probable cause because "Suberu's testimony does no more than create a surmise or suspicion that Kroger did not believe she was guilty of shoplifting" and "merely invites speculation that Kroger framed her and lied to the police." *Id.* at 795.

 Broadway points to other pieces of evidence, in addition to his testimony, to negate probable cause. First, Broadway contends that the "chain of events" in this

case is "unsettlingly similar" to that of another of Tranum's business associates, Tom Jorman. Jorman and Tranum were partners in a dealership. After Jorman sold his interest in the dealership to Tranum, Tranum accused Jorman of stealing money from the dealership. Jorman was charged with theft and Tranum filed a civil suit against Jorman. Both cases were dismissed. Tranum testified that the claims against Jorman involved the use of dealership funds to pay for Jorman's Corvette and note payments on a piece of property. Jorman admitted that the dealership had been reimbursed for some funds that were diverted to him, but denied stealing money from the dealership. Tranum admitted that he wanted Jorman to be prosecuted, that Niemeier's accounting firm handled the audit, and that he provided information to the district attorney.

Second, Broadway contends that Tranum "use[s] his power to intimidate employees," in that he would have no reason to threaten Shaw unless he expected that "her non-coerced and truthful statements would not benefit his scheme against David [Broadway]." Third, Broadway contends that Tranum possessed motive to have Broadway prosecuted because Tranum pursued a criminal prosecution against Broadway only after he had been sued by Broadway for slander and slander *per se*, and Tranum was seeking to sell Tranum Ford around the same time as the grand jury investigation. Broadway argues that theft allegations were a way to get rid of Broadway so that Tranum could take Broadway's interest in the dealership "without just compensation" and prevent Ford from discovering Tranum's involvement in Broadway's efforts to mislead Ford.

We cannot say that the facts surrounding Tranum's decision to prosecute are undisputed or that Broadway's testimony

is unsupported by other evidence; thus, the jury bore the responsibility of determining the issue of probable cause. *See Richey*, 952 S.W.2d at 518. The jury could recognize similarities between the Jorman and Broadway cases and believe that Tranum had reasons for threatening Shaw. Moreover, as we held above, the jury could reasonably conclude that Tranum was aware of Broadway's actions and that Tranum had a motive for pursuing criminal charges against Broadway. The record contains evidence to support a finding that Tranum possessed a private motive to harm Broadway and thus acted on something other than a reasonable and honest belief that Broadway had committed theft. *See Kroger*, 216 S.W.3d at 795. Accordingly, the record in this case does not merely "invite speculation," but creates more than a mere "surmise or suspicion" that Tranum could not reasonably and honestly believe that Broadway had committed theft.

**Initiation or Procurement**

 A person initiates a criminal prosecution by filing "formal charges against [the] plaintiff." *Browning–Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288, 293 (Tex.1994). "A person procures a criminal prosecution if his actions were enough to cause the prosecution, and but for his actions the prosecution would not have occurred." *Id.* "A person does not procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another," "unless the person provides information which he knows is false." *Id.* The plaintiff must show that the "prosecutor acted based on the false information" and the false information must have been material to the decision to prosecute. *King v. Graham*, 126 S.W.3d 75, 78 (Tex.2003). "If the decision to prosecute would have been made with or without the false information, the complainant did not

cause the prosecution by supplying false information." *Id.*

 Simpson testified that Tranum informed him of Broadway's actions and delivered Niemeier's report and Shaw's written statement to Simpson. Beals reviewed these documents, interviewed Niemeier, and recommended that an indictment be prepared charging Broadway with theft. Simpson testified that it was his responsibility to decide whether to present the indictment to the grand jury and that he would not have done so had he believed that probable cause did not exist. This testimony suggests that the decision to prosecute Broadway was entirely left to Simpson's discretion. *See Lieck*, 881 S.W.2d at 293.

Accordingly, to prevail on his malicious prosecution claim, Broadway bore the burden of showing that Tranum provided Simpson with material information that he knew to be false and that Simpson's decision to prosecute Broadway would not have been made but for this false information. *See id.; see also King*, 126 S.W.3d at 78. Broadway presents two arguments to satisfy this burden: (1) Tranum failed to fully disclose relevant facts to Simpson; and (2) Tranum provided Simpson with false information accusing Broadway of theft.

At trial, Simpson testified that the following facts would have been relevant to his decision to prosecute Broadway: (1) that Tranum knew about or directed Broadway's actions; (2) that Tranum threatened Shaw, who later expressed doubt as to the truth of her written statement; and (3) that Tranum knew the outcome of Niemeier's report prior to its completion. Tranum argues that these were mere hypotheticals and that the information he provided Simpson was not false. However, we have already determined that the record contains some evidence that

Broadway acted with Tranum's knowledge or instruction. The record also contains evidence that Tranum threatened Shaw. Moreover, several witnesses testified that, after Broadway resigned in January 2001, Tranum began accusing Broadway of theft and embezzlement. In March 2001, Broadway sued Tranum for slander and slander *per se.* Niemeier issued his report in April 2001. That Tranum began lodging accusations against Broadway prior to completion of Niemeier's report does not necessarily establish that Tranum knew, in advance, what specific findings Niemeier would reach, but certainly suggests that he may have known about Broadway's actions.

Although Simpson testified that he had no reason to believe that Tranum would withhold information, the record does not suggest that Tranum disclosed the circumstances surrounding Shaw's statement or Broadway's actions. Simpson testified that Tranum accused Broadway of committing "theft or fraud or something along that line." Tranum provided Simpson with documents accusing Broadway of theft. This information could not be completely accurate because it omitted one vital fact: that Broadway acted with Tranum's consent. *See Richey,* 952 S.W.2d at 519 (failure to "fully and fairly disclose all material information" is relevant to causation). Tranum could not believe that Broadway committed theft if he acted with Tranum's consent or that information accusing him of such could be entirely true. The jury could infer that he knowingly provided Simpson with misleading information that falsely accused Broadway of theft. "[A]n intelligent exercise" of Simpson's discretion became impossible upon receipt of this information. *Lieck,* 881 S.W.2d at 293–94 (quoting RESTATEMENT (SECOND) OF TORTS § 653 cmt. g (1977)).

Simpson testified that Broadway would not have been prosecuted without Tranum's information. He further testified that information that Shaw's statement was coerced and Broadway acted with Tranum's consent would have been relevant to his decision to prosecute Broadway. Tranum argues that Simpson did not testify that this information would have *changed* his decision. Neither did Simpson testify that his decision *would not* have been different. The jury could infer that this information was material and would certainly change Simpson's decision to present an indictment to the grand jury, particularly if a crucial element of the crime could not be established, and that the omission of this information, coupled with Tranum's false allegations, caused Broadway to be prosecuted. *See City of Keller,* 168 S.W.3d at 821 ("Even if evidence is undisputed, it is the province of the jury to draw from it whatever inferences they wish, so long as more than one is possible and the jury must not simply guess"); *see also In re Bexar County Crim. Dist. Attorney's Office,* 224 S.W.3d 182, 186 (Tex.2007) ("direct evidence of causation," such as testimony from the prosecutor, is not required).

**Malice**

Malice constitutes "ill will, evil motive, or gross indifference or reckless disregard of the rights of others, and may be established by direct or circumstantial evidence." *J.C. Penney Co., Inc. v. Ruth,* 982 S.W.2d 586, 590 (Tex.App.-Texarkana 1998, no pet.). A plaintiff need only prove that the "defendant committed wrongful acts in reckless disregard of another's rights and with indifference as to whether that party would be injured." *Id.*

Tranum presents two arguments in support of his contention that he did not act with malice. First, he argues that the jury's finding that Broadway

breached his fiduciary duty to the dealership is inconsistent with its malice finding. "To preserve error that the jury's findings are inconsistent, the complaining party must raise an objection in the trial court before the jury is discharged." *Kennedy Ship & Repair, L.P. v. Pham*, 210 S.W.3d 11, 24 (Tex.App.-Houston [14th Dist.] 2006, no pet.). Having failed to raise the issue of an inconsistency or conflict in the jury's verdict prior to the jury's discharge, Tranum has not preserved this issue for appeal. *See id.*

Second, Tranum argues that he acted "upon facts he reasonably believed to be true" and in accordance with his legal right as "owner of Tranum Ford" to ensure that "employees are not committing wrongful, even illegal acts." (citing *Closs v. Goose Creek Consol. Indep. Sch. Dist.*, 874 S.W.2d 859, 878 (Tex.App.-Texarkana 1994, no pet.) ("Malice cannot be predicated upon acts which the actor had a legal right to do")). This argument ignores two facts: (1) the jury found that Tranum breached his fiduciary duty to Tranum Ford; and (2) the record contains evidence that Tranum knew Broadway was altering the financial statements, a fact he failed to disclose to Simpson. *See Richey*, 952 S.W.2d at 519 (failure to fully and fairly disclose material information to the prosecutor is relevant to the issue of malice). The jury could have reasonably found that Tranum did not possess probable cause to believe that Broadway committed a crime, and so the jury could infer malice. *See Thrift v. Hubbard*, 974 S.W.2d 70, 80 (Tex. App.-San Antonio 1998, pet. denied) (malice "may be inferred from lack of probable cause").

Moreover, the record contains evidence that Tranum wanted to harm Broadway. Tranum told Sherry Sartor, former executive director of the local chamber of commerce, that Broadway "had stolen money from him" and that he planned to tell other businesses about Broadway. According to Sartor, Tranum appeared to want to hurt Broadway or let people know that Broadway had "done something wrong towards him." Until Tranum approached her, Sartor was unaware that Broadway was no longer employed with Tranum Ford. Vernon Farmer, an acquaintance of both Tranum and Broadway, testified that Tranum said that he was "going to get him [Broadway], I'm going to prosecute him." Broadway had heard that Tranum was "going to take me down, take me to the police, theft, turn me into the F.B.I. and do all kind of investigations, and try to ruin my credit and see me in bankruptcy." The jury could reasonably conclude that Tranum acted with indifference as to whether Broadway would be injured and thus acted with malice when he procured criminal proceedings against Broadway. *See Ruth*, 982 S.W.2d at 590.

## Conclusion

The evidence at trial "rises to a level that would enable reasonable and fairminded people to differ in their conclusions." *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). From this evidence reasonable jurors could draw a reasonable and logical inference that Tranum maliciously prosecuted Broadway. Crediting all favorable evidence that reasonable jurors could believe and disregarding all contrary evidence except that which they could not ignore, we conclude that the evidence is legally sufficient to support the jury's finding that Tranum maliciously prosecuted Broadway. *See City of Keller*, 168 S.W.3d at 830.

Viewing all the evidence in a neutral light, we also find that it is factually sufficient to support the jury's finding. Reasonable jurors could disbelieve Tranum's evidence that he did not maliciously prosecute Broadway. Thus, we cannot say that

the finding is so contrary to the over-whelming weight of the evidence that it is clearly wrong and unjust. *See Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998). Although there were conflicts in the evidence, we will not substitute our judgment for that of the jury's. *See Jackson,* 116 S.W.3d at 761.

## Slander

 Slander constitutes a "defamatory statement that is orally communicated or published to a third person without legal excuse." *Randall's Food Mkts. v. Johnson,* 891 S.W.2d 640, 646 (Tex.1995). A statement may be slander *per se,* injurious in itself, or slander *per quod. Moore v. Waldrop,* 166 S.W.3d 380, 384 (Tex. App.-Waco 2005, no pet.). Truth is a defense to slander. *See Randall's,* 891 S.W.2d at 646.

Roger Starcher, a former Tranum employee, testified by deposition that Tranum held a meeting after Broadway resigned. Starcher did not attend the meeting, but heard from an unknown party that Tranum was "very unhappy" with Broadway and that Broadway "had done some things that he was going to be going to jail for." Tranum told Farmer that Broadway was "gone" and a "thief, crook, something to that effect." Lynn Barnett, owner of an auto salvage business, testified that Tranum told her that his business had failed because Broadway had stolen or embezzled money from him. Tranum told Sartor that Broadway was a "thief" and had stolen money. Tranum "apologized for him [Broadway] ever being a part of the Chamber, ever volunteering, ever representing his company, and just apologized." Ral-

ston was present for part of a meeting, wherein Tranum stated that Broadway was no longer employed with Tranum Ford and that there would be a management change, but he did not accuse Broadway of stealing money or state that he planned to ensure that Broadway went to jail.

Tranum denied calling Broadway a "thief" or accusing him of stealing or embezzling money. He testified that anyone who stated otherwise is "mistaken." Tranum specifically denied making the statements testified to by Sartor, Barnett, and Farmer. He explained that his purpose for visiting Sartor was to ensure that the dealership had no further commitments to the chamber. Tranum admitted that he may have said that Broadway was no longer employed by the dealership and that an audit was going to be performed because some money was missing, but he made sure that no one thought he was accusing Broadway of any wrongdoing. Only after he received Niemeier's report did Tranum disclose the fact that money had been misappropriated.

 Based on Niemeier's report and Shaw's written statement, Tranum argues that his statements were substantially true.[4] We disagree. In light of evidence that Broadway acted with Tranum's knowledge or instruction, the jury could reasonably conclude that Tranum's statements were not substantially true.

Moreover, because Tranum's statements accused Broadway of committing crimes, theft and embezzlement, and injured Broadway in his profession, the record contains evidence that Tranum's statements were slanderous *per se. See Moore,*

---

4. Tranum again asserts that the jury's slander finding conflicts with its finding that Broadway committed a breach of fiduciary duty and argues that "a new trial is warranted on this basis alone." Tranum cites no authority for this proposition and has failed to preserve this issue for appeal. *See Kennedy Ship & Repair, L.P. v. Pham,* 210 S.W.3d 11, 24 (Tex.App.-Houston [14th Dist.] 2006, no pet.).

166 S.W.3d at 384 (accusing someone of committing a crime constitutes slander *per se* ); *see also Morrill v. Cisek,* 226 S.W.3d 545, 550 (Tex.App.-Houston [1st Dist.] 2006, no pet.) (citing *Bradbury v. Scott,* 788 S.W.2d 31, 38–39 (Tex.App.Houston [1st Dist.] 1990, writ denied) ("To charge an employee with dishonesty in his dealings with his employer is slanderous per se in that it falls within the general classification of 'words that affect a person injuriously in his profession or occupation' ")); *Bennett v. Computer Assocs. Int'l,* 932 S.W.2d 197, 200 (Tex.App.-Amarillo 1996, writ denied) ("One who falsely imputes to another the crime of theft commits slander *per se* "). Accordingly, we hold that the evidence is legally and factually sufficient to support the jury's finding that Tranum slandered Broadway. *See Havner,* 953 S.W.2d at 711; *see also City of Keller,* 168 S.W.3d at 830; *Ellis,* 971 S.W.2d at 407.

### Mental Anguish Damages

■■■■ To recover mental anguish damages, a plaintiff must produce: (1) "direct evidence of the nature, duration, or severity of [plaintiffs'] anguish, thus establishing a substantial disruption in the plaintiffs' daily routine;" or (2) other evidence of "a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger." *Parkway Co. v. Woodruff,* 901 S.W.2d 434, 444 (Tex.1995). "Not only must there be evidence of the existence of compensable mental anguish, there must also be some evidence to justify the amount awarded." *Saenz v. Fid. & Guar. Ins. Underwriters,* 925 S.W.2d 607, 614 (Tex.1996). The jury "cannot simply pick a number and put it in the blank." *Id.* "There must be evidence that the amount found is fair and reasonable compensation." *Id.*

### Evidence of Mental Anguish for Malicious Prosecution

Broadway testified that he had suffered "mental strain," worried "about it every day," was subjected to "a grand jury investigation," and received harassing calls from creditors. He was "scared to death" to testify before the grand jury but chose to do so because "I wanted to protect my name," it's "all I've got left," and "I didn't do anything wrong." He has been divorced a total of four times and blames the situation with Tranum for two of these divorces, one of which took place after he resigned from Tranum Ford. He "became withdrawn and distant," trying to cope and "sustain a life to support a family and pay bills, just the day-to-day pressures." He did not see a psychiatrist or psychologist, but spoke to his family doctor, something with which he did not feel comfortable. He was offered antidepressants but refused.

He noted the difficulty of having "been in business for seven years in a community and you see people in the community that know, well, that's the guy that ran the Ford house that stole all the money, I mean, you walk into the restaurant and you see them look up and it's kind of like . . ." He wonders "how people still think about it," "[h]ow they still think about me," "what they still think about me," and "[w]hether I should stay here or just pack up and move off."

Broadway has been continuously employed in the automobile industry since he resigned. Two weeks after resigning, he became the new car sales manager at a dealership in Killeen. He secured this job before any rumors had spread. When he returned to Gatesville about a year later, rumors had begun circulating and he was unable to secure a manager's position. He secured a sales position with another dealership and approximately one year later

assumed the position of used car manager, a "mid-management position." He unsuccessfully applied for other management positions at different dealerships. He was unable to procure employment with anyone who did not know him from the past, and no one familiar with his past would return his calls. At some point, he was approached and offered the position of finance manager for a used car lot in Waco. He was in this position at the time of trial. He has re-mortgaged his home and sold his last piece of property, other than his home, to pay a bank debt. He does not own a car. He testified that it has taken him five years to get to this point.

In reliance on *Woodruff, Saenz,* and *Burleson State Bank v. Plunkett,* 27 S.W.3d 605 (Tex.App.-Waco 2000, pet. denied), Tranum argues that Broadway's testimony is insufficient to establish mental anguish. Arguing that his testimony is sufficient, Broadway relies on *Houston Livestock Show & Rodeo, Inc. v. Hamrick,* 125 S.W.3d 555 (Tex.App.-Austin 2003, no pet.) and *Valley Nissan, Inc. v. Davila,* 133 S.W.3d 702 (Tex.App.-Corpus Christi 2003, no pet.).

In *Woodruff,* testimony that "I was hot," "I was very disturbed," "it changed our life style," "It's just not pleasant," "It was just upsetting," "I was just upset," and it "caused some friction between us" amounted to mere expressions of "anger, frustration, or vexation." *Woodruff,* 901 S.W.2d at 445. The testimony "cite[s] the existence of 'mere emotions': 'I was hot,' 'It was just upsetting,' and 'I was just upset'" and fails to "support the conclusion that the Woodruffs suffered compensable mental anguish." *Id.*

In *Saenz,* statements that "I was worried," "I was worried also that we were going to lose our house," and "we couldn't afford the medical bills" failed to establish mental anguish. *Saenz,* 925 S.W.2d at 614.

The plaintiffs "proved worry, anxiety, vexation and anger, but failed to prove that their distress involved more than these emotions." *Id.*

In *Plunkett,* we found Byron Moss' testimony that "he was unable to sleep," "he suffered from headaches, diarrhea, vomiting, and depression," "the strain had affected his work," and "he had not been able to build any more houses since this incident" sufficient to support a finding that Byron suffered " 'a high degree of mental pain and distress' which caused a serious disruption in his daily routine." *Plunkett,* 27 S.W.3d at 617. The evidence "addresses the nature and severity of the mental pain and distress Byron suffered over an extended period." *Id.* at 618.

In *Hamrick,* three Livestock Show participants and their parents provided testimony establishing the mental anguish they suffered as a result of being disqualified by the Livestock Show. *See Hamrick,* 125 S.W.3d at 564–65. Each plaintiff testified as to their physical and emotional symptoms. *Id.* at 579–80. The Austin Court found "legally and factually sufficient evidence of compensable mental anguish." *Id.* at 580.

In *Davila,* Jessica Davila testified that, "They humiliated me in front of their employees and threatened to call the cops if we left with the truck and kind of rushed us to hurry up and get our stuff out and watched us do it," "They used vulgar language towards Mr. Rodriguez and I," and she "had no way to get home, and had to call someone." *Davila,* 133 S.W.3d at 716. The Corpus Christi Court found that the "public humiliation of having one's truck repossessed" supported mental anguish. *Id.*

██ In light of the above cases, we cannot say that Broadway provided sufficient evidence of the nature, duration, or

severity of mental anguish. *See Woodruff,* 901 S.W.2d at 444. His evidence does not rise to the level of establishing a substantial disruption in his daily routine or "a high degree of mental pain and distress" necessary for compensable mental anguish. *Id.* For this reason, the evidence is legally insufficient to support the jury's finding that Broadway suffered mental anguish damages as a result of Tranum's malicious prosecution, and the jury's award of $500,000 in mental anguish damages for malicious prosecution cannot stand. *See Saenz,* 925 S.W.2d at 614.

### Evidence of Mental Anguish for Slander

■■■ Because Tranum's statements were slanderous *per se,* Broadway was not required to present "independent proof" of mental anguish, "as the slander itself gives rise to a presumption of these damages." *Moore,* 166 S.W.3d at 384 (citing *Mustang Athletic Corp. v. Monroe,* 137 S.W.3d 336, 339 (Tex.App.Beaumont 2004, no pet.)). "The amount of damages in a defamation case is peculiarly within the province of the fact-finder, and an appellate court will not disturb the verdict or award unless it appears from the record to be excessive or the result of passion, prejudice, or other improper influences." *Morrill,* 226 S.W.3d at 550.

■■■ The record in this case does not indicate that the jury's award of past mental anguish damages in the amount of $250,000 is either excessive or the result of passion, prejudice, or other improper influence. The amount was within the jury's discretion and we will not substitute our judgment for that of the jury even if we might have reached a different result. *See Peshak v. Greer,* 13 S.W.3d 421, 427 (Tex. App.-Corpus Christi 2000, no pet.) ("amount of general damages is very difficult to determine, and the jury is given wide discretion in its estimation of them"); *see also Checker Bag,* 27 S.W.3d at 633; *Jackson,* 116 S.W.3d at 761. The evidence is legally and factually sufficient to support the jury's award of $250,000 in mental anguish damages for slander.[5]

### Reputation Damages

■■■ In a malicious prosecution action, a person may recover damage to his reputation "resulting from the accusation brought against him." RESTATEMENT (SECOND) OF TORTS § 670 (1977); *see Eans v. Grocer Supply Co.,* 580 S.W.2d 17, 22 (Tex. Civ.App.-Houston [1st Dist.] 1979, no writ); *see also Thrift,* 974 S.W.2d at 80–81 (affirming award of reputation damages for malicious prosecution).

■■■ The jury awarded Broadway $75,000 in reputation damages for malicious prosecution. Tranum argues that Broadway's reputation was not damaged because (1) witnesses testified that Tranum's statements did not change their opinions of Broadway; and (2) he failed to present evidence that "anyone ever turned him down for a position because of any alleged statement regarding his departure from Tranum Ford." Both arguments address whether Tranum's *statements* damaged Broadway's reputation. The jury did not award reputation damages for slander. That Tranum's *statements* may have damaged Broadway's reputation is irrelevant to our determination of whether the jury

---

**5.** In his fourth issue, Tranum contends that Broadway received a double recovery of mental anguish damages because the mental anguish supporting the awards for both slander and malicious prosecution are the same. We decline to address this issue in light of our determination that the evidence is legally insufficient to support mental anguish damages for malicious prosecution. For this same reason, we need not address Tranum's sixth issue asking us to remit the mental anguish award.

properly awarded reputation damages for malicious prosecution.

Tranum further contends that Broadway failed to offer evidence that he "suffered financially or mentally from damage to his reputation" or received a "reduction in wages or lost profits." He relies on the fact that Broadway was able to secure employment two weeks after resigning from Tranum Ford and eventually secured a higher salary. We do not find these arguments dispositive. Broadway admitted that he has been continuously employed in the automobile industry but testified that his efforts to obtain higher management positions have failed. He was unable to obtain employment with anyone who did not know him from the past. Tranum did not refute this testimony.

As a result of Tranum's malicious prosecution, Broadway was charged with committing the crime of theft. The jury could reasonably conclude that his reputation was subsequently damaged and that $75,000 is a reasonable amount to compensate for this damage. *See Thrift,* 974 S.W.2d at 80–81 ($275,000 in reputation damages for malicious prosecution "reasonable in light of the gross social stigma attached to criminal charges that Hubbard will be burdened with both professionally and socially as long as the indictment remains on her record"). The evidence is legally and factually sufficient to support the jury's award of damages for injury to Broadway's reputation.

### Exemplary Damages

■ Exemplary damages must be established by clear and convincing evidence; thus, an elevated standard of review applies. *Sw. Bell Tel. Co. v. Garza,* 164 S.W.3d 607, 627 (Tex.2004). Under legal sufficiency review, when a jury makes an affirmative finding of malice, we review all the evidence in the light most favorable to the jury's finding, taking into account contrary undisputed facts, to determine whether reasonable jurors could have formed a firm belief or conviction regarding malice. *Qwest Int'l Commcn, Inc. v. AT & T Corp.,* 167 S.W.3d 324, 326 (Tex. 2005); *see also Garza,* 164 S.W.3d at 627; *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex.2002). Under factual sufficiency review, we give due consideration to any evidence the factfinder could reasonably have found to be clear and convincing. *J.F.C.,* 96 S.W.3d at 266. We must consider the disputed evidence and determine whether a reasonable factfinder could have resolved that evidence in favor of the finding. *Id.* The evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of its finding is so significant that a factfinder could not have reasonably formed a firm conviction or belief. *Id.*

### Malice

For exemplary damages, malice constitutes: (1) a specific intent by the defendant to cause substantial injury or harm to the claimant; or (2) an act or omission:

(i) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(ii) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

Act of April 20, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 109 (amended 2003) (current version at TEX.

CIV. & PRAC. REM.CODE ANN. § 41.003 (Vernon Supp.2007)).[6]

■■■ Tranum argues that he did not act with malice because the jury found that (1) Broadway breached his fiduciary duty to Tranum Ford; (2) Tranum had probable cause to bring the case to Simpson; (3) Tranum's statements about Broadway were substantially true; and (4) Tranum acted within his rights when he submitted the case to Simpson and disclosed Broadway's actions to others. He further contends that Broadway suffered no harm as a result of Tranum's actions and that Broadway, having breached his fiduciary duty to Tranum Ford, had "unclean hands."

However, the record contains sufficient evidence by which the jury could determine that Tranum acted with a "specific intent" to cause Broadway "substantial injury or harm." Tranum made statements accusing Broadway of theft and embezzlement. He told Farmer that he wanted to "get" Broadway and "prosecute" him. Sartor was under the impression that Tranum wanted to "hurt" Broadway. Broadway himself had heard that Tranum wanted to turn him over to the police, ruin his credit, and send him into bankruptcy. The truth of whether Broadway had committed the criminal acts with which he was accused was uniquely within Tranum's knowledge. Yet, he proceeded to spread these accusations among members of the very community wherein Broadway lived and worked, including the district attorney and those associated with the automobile industry. The jury could have "formed a firm belief or conviction" that Tranum act-

ed with malice. *See Qwest*, 167 S.W.3d at 326; *see also J.F.C.*, 96 S.W.3d at 266.

**Amount of Exemplary Damages**

The jury found that Tranum acted with malice and awarded a total of $825,000 in actual damages and $750,000 in exemplary damages. In addition to challenging the legal and factual sufficiency of the exemplary damages award, Tranum presents several other issues addressing the amount of exemplary damages: (1) the award is unconstitutional (issue two); (2) the trial court failed to tie exemplary damages to a cause of action (issue three); and (3) we should remit the amount of exemplary damages in the event we strike or reduce the award of mental anguish damages (issue five).

We begin with Tranum's third issue, wherein he argues that because the trial court submitted a single question inquiring as to the amount of exemplary damages, we cannot ascertain whether the award is based on malicious prosecution, slander, or both. *See Cathey v. Meyer*, 115 S.W.3d 644, 666–67 (Tex.App.-Waco 2003), *rev'd in part on other grounds*, 167 S.W.3d 327 (Tex.2005) (per curiam); *see also San Antonio Credit Union v. O'Connor*, 115 S.W.3d 82, 102–03 (Tex.App.-San Antonio 2003, pet. denied).[7] However, after reducing the amount of mental anguish damages, we must automatically reevaluate the exemplary damages award to determine whether the award is excessive. *See Bunton v. Bentley*, 153 S.W.3d 50, 51, 54 (Tex. 2004).

■■■ In doing so, we need not reach the issue of whether the $750,000 exemplary damages award is *unconstitutionally* ex-

---

6. Because this case was filed before September 1, 2003, we apply the law in effect at that time. *See Dillard Dep't Stores, Inc. v. Silva*, 148 S.W.3d 370, 373 (Tex.2004).

7. Tranum did not object to the trial court's charge on exemplary damages. *See Green Intl., Inc. v. Solis*, 951 S.W.2d 384, 389–390 (Tex.1997); *see also Barnett v. Coppell N. Tex. Court, Ltd.*, 123 S.W.3d 804, 826 (Tex.App.-Dallas 2003, pet. denied).

cessive, as it is excessive under section 41.008(b) of the Civil Practice & Remedies Code. Section 41.008(b) provides that exemplary damages "may not exceed an amount equal to the greater of ... two times the amount of economic damages; plus ... an amount equal to any noneconomic damages found by the jury, not to exceed $750,000." TEX. CIV. PRAC. & REM. CODE ANN. § 41.008(b)(1)(A)-(B) (Vernon Supp.2007).

In *Shell Oil Prods. Co. v. Main St. Ventures,* 90 S.W.3d 375 (Tex.App.-Dallas 2002, pet. dism'd by agr.), the Dallas Court "reversed a substantial portion of the actual damages awarded by the jury." *Id.* at 386. Shell argued that this reversal required the appellate court to "remand the cause to the trial court 'for reconsideration of the punitive damage award.'" *Id.* Citing section 41.008, the Dallas Court noted that "the exemplary damage award is currently more than two times the amount of the actual damages that we have affirmed." *Id.* Declining to remand the case, the Dallas Court reformed the punitive damages award to an amount two times the amount of affirmed actual damages. *See id.* (citing *Gunn Infiniti, Inc., v. O'Byrne,* 996 S.W.2d 854, 861 (Tex.1999) (after mental anguish damages were reversed, DTPA damages were reformed to satisfy statutory limits)). We believe that this is the proper procedure to follow in the present case.

Here, no economic damages were awarded; exemplary damages may not exceed an amount equal to the amount of non-economic damages, *i.e.* $325,000. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.008(b)(1)(B). Accordingly, we modify the judgment to award $325,000 in exemplary damages. *See Shell Oil,* 90 S.W.3d

at 386. We need not address Tranum's second and fifth issues. *See* TEX.R.APP. P. 47.1.

## EXPERT TESTIMONY

■ In his seventh issue, Tranum contends that the trial court improperly excluded Niemeier's expert testimony. Three days before trial, Tranum filed his first response to Broadway's request for disclosures, designating Niemeier as an expert witness. Broadway moved to exclude Niemeier's expert testimony. Tranum admitted that his response was not timely. Concluding that Niemeier was not timely designated as an expert witness, the trial court allowed Niemeier to be called solely as a fact witness.

■ An expert witness who is not timely identified during discovery will not be permitted to testify unless the court finds good cause for the proponent's failure to timely identify the expert or finds that the opposing party is not unfairly surprised or prejudiced by the expert's testimony. *In re Toyota Motor Corp.,* 191 S.W.3d 498, 501 (Tex.App.-Waco 2006, no pet.); *see* TEX.R. CIV. P. 193.6. We review a trial court's exclusion of expert testimony for abuse of discretion. *K–Mart Corp. v. Honeycutt,* 24 S.W.3d 357, 360 (Tex. 2000).

■ Tranum contends that Broadway could not have been unfairly surprised or prejudiced by the untimely designation of Niemeier as an expert because he received a copy of Niemeier's report several years before trial and should have known that Tranum would rely on the accounting firm for expert testimony.[8] We addressed a similar argument in *Barr v. AAA Tex., LLC,* wherein the Barrs identified Jerry

---

8. Broadway argues that Tranum failed to preserve this issue for appeal. However, the record indicates that Tranum made his posi-

tion known to the trial court and the trial court made a ruling. *See* TEX.R.APP. P. 33.1.

Condra as a person with knowledge of relevant facts, but at trial, called Condra as an expert. *See* 167 S.W.3d 32, 36 (Tex. App.-Waco 2005, no pet.). The trial court excluded the testimony. *Id.* On appeal, the Barrs contended that "AAA was not surprised or prejudiced because their disclosure to AAA of Condra's invoices and the correspondence regarding the Barrs' dispute with Condra over the amount they would pay him gave AAA sufficient notice that Condra had knowledge regarding the reasonableness and necessity of the charges." *Id.* at 37. We construed this as a "contention that AAA should have anticipated that the Barrs would call Condra to establish this element of their claim" and held that " 'the rules were revised to make that sort of anticipation unnecessary.' " *Id.* (quoting *Ersek v. Davis & Davis, P.C.,* 69 S.W.3d 268, 272 (Tex.App.-Austin 2002, pet. denied)); *see also Alvarado v. Farah Mfg. Co.,* 830 S.W.2d 911, 915 (Tex.1992) ("A party is entitled to prepare for trial assured that a witness will not be called because opposing counsel has not identified him or her in response to a proper interrogatory"). That Broadway was aware of Niemeier's report and may have been aware that Niemeier might be called as an expert witness does not negate unfair surprise or prejudice.

Tranum asserts numerous other arguments to support his position that Broadway was not unfairly surprised or prejudiced. First, he relies on his identification of the report and the accounting firm in his interrogatory response. This response merely identifies employees of the accounting firm as persons with whom Tranum had conversations regarding any "improper conduct and illegal conduct" by Broadway and identifies the accounting firm as a *consulting* expert. It fails to identify any potential *testifying* experts.

Second, he argues that Broadway's motion was based on the "gate-keeper criteria" of Rules of Evidence 702, 703, and 705, yet the trial court excluded Niemeier's expert testimony on the basis that he was untimely designated. He places some emphasis on the fact that Broadway challenged the timeliness of Tranum's response only after arguing that documents supporting Niemeier's conclusions were not produced and Niemeier's testimony did not comply with "gate-keeper criteria." The order of Broadway's arguments is not evidence of a lack of surprise or prejudice.

Finally, Tranum argues that a failure to *timely* designate experts as opposed to a complete *failure* to identify experts indicates a lack of surprise or prejudice. Rule 193 does not contemplate such a distinction. *See* Tex.R. Civ. P. 193.6 (one "who fails to make, amend, or supplement a discovery response in a *timely* manner may not introduce in evidence the material or information that was not *timely* disclosed") (emphasis added). He further argues that Broadway deliberately took no action to compel because he knew that the answer would identify Niemeier. The record is silent as to counsel's reasons for failing to compel Tranum's responses to disclosure and we will not so speculate.

In summary, we cannot say that the trial court abused its discretion by excluding Niemeier's expert testimony. *See Honeycutt,* 24 S.W.3d at 360. We overrule Tranum's seventh issue.

## CONCLUSION

Because the evidence is legally insufficient to support the award of mental anguish damages for malicious prosecution, we modify the judgment to delete that award. In light of our reduction in the amount of actual damages, we modify the judgment to reduce the exemplary dam-

ages award from $750,000 to $325,000. The judgment is affirmed as modified.

Chief Justice GRAY concurs in the judgment of the Court. A separate opinion will not issue.

Justice VANCE dissenting.

BILL VANCE, Justice, dissenting.

I respectfully dissent.[1] TEX.R.APP. P. 47.5.

SLANDER

I fully agree to affirm the trial court's judgment concerning Broadway's slander claim.

MALICIOUS PROSECUTION

I also agree with the deletion of the award of mental anguish damages for malicious prosecution, concluding that the evidence is legally insufficient to support that award, but I would not reach that issue in light of my disagreement about the evidentiary support for the claim itself. I would hold that Broadway failed to produce legally sufficient evidence of at least two of the necessary elements to recover for malicious prosecution.

INITIATION OR PROCUREMENT OF PROSECUTION

There is no evidence that a prosecution was commenced, as I understand that term.[2] The evidence conclusively shows that Tranum presented information to the District Attorney, the District Attorney reviewed the information and talked to potential witnesses, and the District Attorney (not Tranum) exercised his own discretion in making the decision to present the information to the grand jury. The record does not show that Tranum signed a criminal complaint, that Broadway was

ever arrested, or that he was required to make bond. The evidence shows that the first step towards a formal criminal charge was presentation of the results of the investigation to the grand jury by the District Attorney, and that action resulted in a "no-bill."

I find no evidence that Tranum filed "formal charges against [the] plaintiff." *Browning–Ferris Indus., Inc. v. Lieck,* 881 S.W.2d 288, 293 (Tex.1994) (grand jury indicted Lieck). In *Lieck,* the Supreme Court said:

Initiation would not ordinarily need to be defined, as it would be demonstrated by evidence that *defendant filed formal charges against plaintiff,* but procurement should be defined as follows:

A person procures a criminal prosecution if his actions were enough to cause the prosecution, and but for his actions the prosecution would not have occurred. A person does not procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another, including a law enforcement official or the grand jury, unless the person provides information which he knows is false. A criminal prosecution may be procured by more than one person.

*Id.* (emphasis added). So, Tranum did not "initiate" a criminal prosecution, but did he "procure" one?

The opinion relies on the notion that the evidence shows that "Tranum provided [District Attorney] Simpson with material information that he knew to be false and that Simpson's decision to prosecute Broadway would not have been made but for this false information." The problem

1. Chief Justice Gray docs not join Justice Reyna's opinion.

2. I have not found a case in which the plaintiff who asserted a malicious prosecution claim was never formally charged with a crime.

with that analysis, as I see it, is that Simpson did not file formal charges—he left that decision to the grand jury, and the grand jury returned a "no-bill." If the grand jury or other official would have made the same decision with or without the false information, the complainant did not cause the prosecution by supplying false information. *See King v. Graham*, 126 S.W.3d 75, 78 (Tex.2003) (grand jury indicted Graham for felony theft) ("a person who knowingly provides false information to the grand jury or a law enforcement official who has the discretion to decide whether to prosecute a criminal violation cannot be said to have caused the prosecution if the information was immaterial to the decision to prosecute"). Here, the grand jury's decision not to prosecute would have been no different without the information that Broadway claims was false; thus, that information, false or not, was immaterial to the decision that the grand jury made.

Finally, "to recover for malicious prosecution when the decision to prosecute is within another's discretion, the plaintiff has the burden of proving that that decision would not have been made but for the false information supplied by the defendant." *Id.* at 78. The memo described below, prepared at Simpson's direction prior to the presentation of the matter to the grand jury, dispels the idea that any false information Tranum gave was material to Simpson's decision to present the matter to the grand jury.

There is no evidence that a criminal prosecution was commenced and no basis for the finding that Tranum initiated or procured a prosecution.

Lack Of Probable Cause

"Courts must be especially careful in malicious prosecution cases to ensure that sufficient evidence supports each element of liability." *Kroger Texas Ltd. Partner-*

*ship v. Suberu*, 216 S.W.3d 788, 795 (Tex. 2006) (Suberu spent four hours in jail after arrest; jury acquitted her of misdemeanor theft). However, an acquittal does not establish the absence of probable cause. *Id.* at 794. "[I]t is well settled that a private citizen has no duty to investigate a suspect's alibi or explanation before reporting a crime." *Id.* "If the acts or omissions necessary to constitute a crime reasonably appear to have been completed, a complainant's failure to investigate does not negate probable cause." *Id.* Further, any failure to fully disclose all relevant information to the District Attorney is immaterial to the probable-cause inquiry. *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 519 (Tex.1997).

Included in exhibit 14 is a memorandum from Bruce Beals, a legal assistant to District Attorney Simpson, stating as a conclusion:

> Based on the interview with Niemeier (the accountant), a review of the report he provided, Broadway's employment contract, the statement provided by Ms. B.J. Shaw, and the applicable portions of the Texas Penal Code, it is my conclusion that there is reason to believe that David C. Broadway intentionally misrepresented the amount of annual net profit of Tranum Ford–Mercury in order to obtain a yearly bonus, thereby unlawful (sic) appropriating funds (property) from Tranum. These bonuses totaled more than $20,000 but less than $100,000 during the period 1995–2000.

Beals recommended that an indictment be prepared, naming Broadway as the defendant, that the case be presented to the grand jury, and that Niemeier and Ms. Shaw be called as witnesses.

The opinion discusses "Tranum's decision to prosecute," but the decision to present the information to the grand jury was Simpson's, and according to Beals's

memo, the decision was based on Niemeier's interview and report, the employment contract, and Ms. Shaw's statement. The memo demonstrates conclusively that the District Attorney found that probable cause existed to exercise his discretion to present the information to the grand jury. If probable cause existed for presentation to the grand jury, then probable cause existed for Tranum to ask Simpson to investigate Broadway's actions.

EXEMPLARY DAMAGES

Finally, based on my view of the malicious prosecution claim, I must disagree with the decision about the exemplary damages award.

The jury found (1) $75,000 for reputation damages and $500,000 for mental anguish damages for malicious prosecution, (2) $250,000 for mental anguish damages for slander, and (3) $750,000 for exemplary damages. We all agree that the $500,000 is not recoverable but disagree about the $75,000. Eliminating the reputation damages and mental anguish damages would reduce the exemplary damages to $250,000 under Justice Reyna's analysis, with which I agree.

SUMMARY

I would reform the trial court's judgment to delete the amounts awarded by the jury for compensatory damages for malicious prosecution. I would therefore also reform the judgment to limit the award of exemplary damages to $250,000.

I respectfully dissent from the judgment.